In the Matter of a **GRAND JURY SUBPOENA DUCES TECUM DATED NOVEMBER 16, 1974.**

No. M 11–188.

United States District Court,
S. D. New York.

Nov. 13, 1975 and Dec. 18, 1975.

Thomas J. Cahill, U. S. Atty., by Elliot G. Sagor, Asst. U. S. Atty., New York City, for the Government.

David A. Ross, S. E. C., Washington, D. C., Samuel Krieger, New York City, for S. E. C.

Bob Glen Odle, Washington, D. C., for Hogan & Hartson, Respondent.

Lord, Day & Lord, by John W. Castles, III, New York City, for Hogan & Hartson.

Williams, Connolly & Califano, by Pierce O'Donnell, John G. Kester and Robert L. Weinberg, Washington, D. C., for Robert L. Vesco.

Squadron, Gartenberg Ellenoff & Plesent, by Neal M. Goldman, New York City, for Stanley Graze.

Robert D. Foglia, New York City, for Norman E. LeBlanc.

## MEMORANDUM AND ORDER

CONNER, District Judge:

On July 15, 1975, two attorneys associated with Hogan & Hartson, Esqs., a Washington, D.C.-based law firm, appeared before a Special Grand Jury that was charged with investigating suspected securities manipulations by International Controls Corp. (ICC) and Investors Overseas Services, Ltd. (IOS). In response to a subpoena *duces tecum* dated November 26, 1974, the Hogan & Hartson attorneys submitted all documents described in the subpoena to be marked for identification as Grand Jury exhibits. The attorneys nonetheless refused to cede certain of those documents for Grand Jury inspection or to testify to their contents, contending that attorney-client and work-product privileges barred them from doing so. The United States Attorney thereupon applied to this Court for an order to compel production of the documents and rendition of the testimony thus withheld.

The Grand Jury exhibits at issue consist of notations and memoranda recording interviews and discussions held during a series of meetings that spanned the period from October 1972 to January 1973; the sessions thus memorialized had been prompted by a Securities and Exchange Commission (SEC) investigation, and subsequent civil action, focused upon suspected broad-ranging and highly sophisticated securities-fraud schemes involving a multitude of individuals and corporations.[1] These documents, delivered to the Court for *in camera* examination, include the following:

a) Grand Jury Exhibit 3, consisting of handwritten notes taken by Arthur J. Rothkopf, an attorney associated with Hogan & Hartson, at a meeting held in the ICC New Jersey offices on October 9, 1972. The notes recorded, *inter alia*, statements made by Robert L. Vesco, a named respondent in the above-mentioned SEC investigation. But for a brief hiatus that ended on October 9, 1972, Vesco held a variety of principal positions with ICC, both as an officer and as a director, during the period from 1966 to 1973; Vesco was later to be named as an individual defendant in the SEC complaint filed on November 27, 1972, in the Southern District of New York. Also present at

---

1. The SEC complaint was brought against forty-two individual and corporate defendants.

the meeting were additional Hogan & Hartson attorneys, officers and directors of ICC, and Howard Cerny, the latter subsequently named a defendant in the SEC action.

b) Grand Jury Exhibits 1 and 1–A, consisting, respectively, of handwritten notes and a typewritten memorandum executed by Alfred J. Dougherty, a Hogan & Hartson attorney. The notes, and the memorandum based upon them, recorded, *inter alia*, statements made by Norman LeBlanc at a meeting held in Nassau, the Bahamas, on October 28, 1972; LeBlanc, an IOS officer and director from 1970 to the spring of 1972, had been a subject of the SEC investigation and was later to be named an individual defendant in the SEC civil action. Also present at the meeting were another Hogan & Hartson attorney; members of the law firms Paul, Weiss, Rifkind, Wharton and Garrison (Paul, Weiss), then representing Vesco; Steptoe & Johnson and Willkie, Farr and Gallagher, both firms at that time representing IOS; and several individuals who were then targets of the SEC investigation and who were subsequently named as defendants in the SEC complaint.

c) Grand Jury Exhibits 2 and 2–A, consisting, respectively, of handwritten notes and a typewritten memorandum again executed by Dougherty, recording statements made by Stanley Graze at a meeting held in Nassau on December 5, 1972; Graze, a portfolio manager for a number of mutual funds managed by IOS, was among the named individual defendants in the SEC civil action. Also present at the interview was an attorney associated with Steptoe & Johnson.

d) Grand Jury Exhibits 4 and 4–A, consisting of handwritten notes and a typewritten memorandum executed by Sherwin J. Markman, a Hogan & Hartson attorney, recording statements made by Vesco at a meeting held in New York on December 6, 1972. Paul, Weiss attorneys were also present at the interview.

e) Grand Jury Exhibits 5 and 5–A, consisting of handwritten notes and a typewritten memorandum, again executed by Markman, recording statements made by Vesco at a meeting held in Nassau on December 22, 1972. A Paul, Weiss attorney was also present at the interview.

f) Grand Jury Exhibit 6, consisting of a typewritten memorandum executed by Merle Thorpe, Jr., a Hogan & Hartson attorney, recording a discussion between the latter and Vesco in Washington, D. C., on January 10, 1973.

■ The Government's application with respect to the above documents is uniformly opposed by Vesco, LeBlanc, and Graze,[2] through their respective counsel, as well as by Hogan & Hartson. That opposition rests principally on the claim of attorney-client privilege. Under the circumstances of this case, such claim cannot succeed unless 1) the attorney-client privilege may be deemed to attach to communications made in the course, and for the advancement, of a joint defense undertaken by and for independently represented clients, 2) the statements and comments by Vesco, LeBlanc, and Graze were in fact designed to develop or further a joint defense, and 3) the documents recording those communications, if in the first instance thus cloaked by the privilege, have not been divested thereof by virtue of any waiver of that privilege.

I.

This Court begins its inquiry mindful, as it must be, that the attorney-client privilege both serves and disserves the administration of justice. Thus, on the one hand, confidences between a client and his counsel need be preserved lest the course of legal representation founder in the absence of the client's "subjective freedom of mind * * * in seeking legal advice." 8 J. Wigmore, Evi-

---

2. All of the individual respondents currently reside abroad.

dence § 2317 (McNaughton rev. ed. 1961); *In re Colton,* 201 F.Supp. 13, 15 (S.D.N.Y.1961). Nevertheless, at the same time, there remains the competing principle that the public is entitled "to every man's evidence." 8 Wigmore, *supra,* § 2192 at 70.

■ The tension between both principles, always pressing whatever the legal context, is perhaps exacerbated in cases such as the present one. Thus, as the Supreme Court recently observed, in *Branzburg v. Hayes,* 408 U.S. 665, 688, 92 S.Ct. 2646, 2660, 33 L.Ed.2d 626 (1972),

> "[b]ecause its task is to inquire into the existence of possible criminal conduct and to return only well-founded indictments [a grand jury's] investigative powers are necessarily broad. * * * Although the powers of the grand jury are not unlimited * * *, the longstanding principle that 'the public * * * has a right to every man's evidence,' except for those persons protected by a constitutional, common-law, or statutory privilege, * * * is particularly applicable to grand jury proceedings."

This Court, then, is perforce placed in the role of mediator, charged with ensuring that there be no abuse done by or to the privilege, on the one hand, or the necessarily expansive range of the grand jury inquest, on the other.

## II.

The *sine qua non* of the attorney-client privilege is, of course, a confidence reposed—and effectively imposed—for the purpose of obtaining or furthering legal assistance. It therefore must follow, and in general principle it is universally acknowledged, that communications between a client and his counsel in the presence of a "third party," *i. e.,* one who stands in a neutral or adverse position vis-a-vis the subject of the communication, bespeaks the absence of such confidentiality and thus belies any subsequent claim to the privilege. See, *e. g.,*

C. McCormick, Evidence § 91 at 188 (2d ed. 1972); Wigmore, *supra,* § 2311 at 601–03; Annotation, 141 A.L.R. 553 (1942); *cf. In re Horowitz,* 482 F.2d 72 (2d Cir. 1973); *United States v. Tellier,* 255 F.2d 441, 447–48 (2d Cir. 1958).

■ Those cases in which the privilege has been sustained in relation to communications among, or made in the presence of, two or more lay persons and one or more attorneys may be regarded as clarifications of, rather than exceptions to, the rule set forth above. Thus, for example, where there is consultation among several clients and their jointly retained counsel, allied in a common legal cause, it may reasonably be inferred that resultant disclosures are intended to be insulated from exposure beyond the confines of the group; that inference, supported by a demonstration that the disclosures would not have been made but for the sake of securing, advancing, or supplying legal representation, will give sufficient force to a subsequent claim to the privilege. *United States v. United Shoe Machinery Corporation,* 89 F.Supp. 357 (Mass.1950); see McCormick, *supra,* § 91 at 189; 8 Wigmore, *supra,* § 2312 at 603 & n. 1.

■ To be sure, what is divulged by and to the clients present at such a meeting cannot be deemed to be confidential *inter sese* ; in any later controversy between or among those clients, the privilege could not stand as a bar to full disclosure at the instance of any one of them.[3] See, *e. g., Grand Trunk Western R. R. Co. v. H. W. Nelson Co.,* 116 F.2d 823, 835 (6th Cir. 1941); McCormick, *supra,* § 91 at 189–90; 8 Wigmore, *supra,* § 2312 at 605–06; *cf. Garner v. Wolfinbarger,* 430 F.2d 1093, 1103 (5th Cir. 1970). Nonetheless, in the absence of such event and in relation to the rest of the world, the attorney-client communications issuing from such a joint conference are invested with an absolute secrecy.

---

**3.** See pp. 393–395, *infra.*

The Government urges here that the privilege attending joint conferences does not extend to the present case, *i. e.*, where statements have been made, ostensibly for the advancement of a common defense, in the presence of co-defendants or potential co-defendants and their independently retained attorneys. In support of its contention, the Government cites a number of cases involving communications between defendants and their co-defendants' counsel in which claims to the privilege have been disallowed, see *Smale v. United States*, 3 F.2d 101 (7th Cir. 1924); *Leonia Amusement Corp. v. Loew's, Inc.*, 13 F.R.D. 438 (S.D.N.Y.1953); *State v. Hodgdon*, 89 Vt. 148, 94 A. 301 (1915); *Vance v. State*, 190 Tenn. 521, 230 S.W.2d 987, *cert. denied*, 339 U.S. 988, 70 S.Ct. 1010, 94 L.Ed. 1389 (1950). Those cases, however, do not determine the joint defense issue now before this Court, for in none was there demonstrated to have been a joint defense in fact—or, therefore, an attendant confidentiality—upon which the attorney-client privilege might arguably have been based.

Indeed, the guidance of precedent in this precise area is rather unexpectedly spare. This is not to say, however, that decisional precedent is wholly lacking. Thus, the Ninth Circuit's opinions in *Continental Oil Company v. United States*, 330 F.2d 347 (9th Cir. 1964), and *Hunydee v. United States*, 355 F.2d 183 (9th Cir. 1965), are particularly instructive.

In *Continental Oil*, subpoenas *duces tecum* served upon respective counsel for Standard Oil and Continental Oil Companies ordered the production before a Grand Jury of certain memoranda recording counsels' interviews with Standard and Continental employees. The interviews had been conducted both prior to and after those employees' appearances before the Grand Jury, then investigating the companies' activities. Counsel for Standard had interviewed Standard's employees, who were also their individual clients; counsel for Continental had interviewed the Continental employees, also their individual clients. In anticipation of possible litigation involving jointly their respective individual and corporate clients, and as preparation therefor, the attorneys exchanged copies of the memoranda.

Motions to quash the subpoenas were denied by the district court. On appeal, the Ninth Circuit reversed, ruling that the attorney-client privilege placed the memoranda beyond the Grand Jury's reach. The exchange of documents between the Standard and Continental attorneys, the appellate court concluded, had not destroyed the confidence in which those documents had originally been prepared. That conclusion was in large measure impelled by the force of the following language from a Minnesota trial court opinion written some two decades earlier and echoed by the *Continental* court:

"Where an attorney furnishes a copy of a document entrusted to him by his client to an attorney who is engaged in maintaining substantially the same cause on behalf of other parties in the same litigation, * * * the communication is made not for the purpose of allowing unlimited publication and use, but in confidence, for the limited and restricted purpose to assist in asserting their common claims. * * * For the occasion, the recipient of the copy stands under the same restraints arising from the privileged character of the document as the counsel who furnished it * * *. [*Schmitt v. Emery*, 211 Minn. 547, 2 N.W.2d 413 (1942).]" 330 F.2d at 350.

The Government herein argues that *Continental* and kindred cases are not square with our own. But the divergence underscored by the Government, although perceptible to be sure, is nonetheless not critical. In *Continental*, a privilege concededly once established was ruled not to have been waived; in the present case, by contrast, the very genesis of the privilege is itself at issue. But, in practical terms, the dissimilarity between the two cases pares down to nothing more than the factual difference

between disclosures made indirectly and disclosures made directly. If the attorney-client privilege may properly be retained under the former circumstance, its initial availability surely is no less reasonable under the latter.

The Ninth Circuit itself is clearly in accord with the above conclusion. Thus, in *Hunydee v. United States, supra,* the privilege was ruled to cover communications made during a joint conference among two parties, both at the time under Grand Jury investigation, and their respective counsel. Noting that those communications had the purpose and effect of "influenc[ing] the course of [the respective attorneys'] representation," the *Hunydee* court concluded that its own case was entirely receptive to the rule prescribed by *Continental, i. e.,* that

> "where two or more persons who are subject to possible indictment in connection with the same transactions make confidential statements to their attorneys, these statements, even though they are exchanged between attorneys, should be privileged to the extent that they concern common issues and are intended to facilitate representation in possible subsequent proceedings." 355 F.2d at 185. Thus, the *Hunydee* opinion—specifically addressed to a joint conference situation—confirmed that the "exchange between attorneys," within the comprehension of the rule set forth above, might equally be effected through the clients' direct communication as well as through the attorneys' reciprocal transfer of documents recording such communications. See *Pettibone Corp. v. Caterpillar Tractor Co.,* 1974–2 Trade Cas. ¶ 75,419 at 98,383–84 (D.C.Neb. 1974).

Although the Ninth Circuit's rulings, *supra,* are not necessarily binding here,

this Court is persuaded that those rulings are logically consistent with the policy underlying the attorney-client privilege and I thus elect to follow them; at least one decision in this District has intimated a similar disposition. See *Transmirra Products Corp. v. Monsanto Chemical Co.,* 26 F.R.D. 572, 576–77 (S.D. N.Y.1960).[4]

The privilege is, after all, born of the law's own complexity. The layman's course through litigation must at least be evened by the assurance that he may, without penalty, invest his confidence and confidences in a professional counsellor. See *United States v. Kovel,* 296 F.2d 918, 921 (2d Cir. 1961). That assurance is no less important or appropriate where a cooperative program of joint defense is helpful or, *a fortiori,* necessary to form and inform the representation of clients whose attorneys are each separately retained. Hence the following observations, in dicta issuing a century ago from a Virginia appellate court:

> "The parties were jointly indicted for a conspiracy * * *. They might have employed the same counsel, or they might have employed different counsel as they did. But whether they did the one thing or the other, the effect is the same, as to their right of communication to each and all of the counsel, and as to the privilege of such communication. They had the same defence to make, the act of one in furtherance of the conspiracy, being the act of all, and the counsel of each was in effect the counsel of all * * *. They had a right, all the accused and their counsel, to consult together about the case and the defence, and it follows as a necessary consequence, that all the information, derived by any of the counsel from such consultation, is privileged * * *."

---

4. Transmirra parenthetically suggests that at least two district court decisions have indicated a contrary disposition. 26 F.R.D. at 577. However, in neither of those cases—*Radio Corporation of America v. The Rauland Corporation,* 18 F.R.D. 440 (N.D.Ill.E.D.1955), and *Rediker v. Warfield,* 11 F.R.D. 125 (S.D.N.Y. 1951)—was a joint defense involved. Indeed, each case turned upon the traditional rule that the attorney-client privilege does not apply to communications with counsel by or in the presence of neutral third parties or in the expectation of publication to neutral third parties.

*Chahoon v. The Commonwealth,* 62 Va. (21 Gratt.) 822, 841–42 (1871).

■ For the reasons stated above, I conclude that the attorney-client privilege covers communications to a prospective or actual co-defendant's attorney when those communications are engendered solely in the interests of a joint defense effort.

### III.

The question remains whether these particular respondents in fact reasonably believed at the time of their meetings and interviews that their statements were being made within the context, and in furtherance, of their joint defense. *Cf.* McCormick, *supra,* § 88 at 179. Respondents concede that the burden is theirs on this issue. See, *e. g., In re Bonanno,* 344 F.2d 830, 833 (2d Cir. 1965); *United States v. Kovel,* 296 F.2d 918, 923 (2d Cir. 1961). To help resolve the question, the parties were ordered to appear at a hearing and to present evidence bearing upon the existence of a joint defense among the relevant persons and entities at the relevant times. The evidentiary hearing was held before this Court on July 23, 1975, and was continued on July 30, 1975. The testimony adduced at that hearing and the affidavits and exhibits submitted in connection with this motion reveal the following facts.

In March 1971, the SEC inaugurated a wide-scale formal investigation of the business interrelations and dealings of ICC and Vesco, among others, with IOS and IOS affiliates. During the course of the investigation, respondents ICC and Vesco were represented by Hogan & Hartson, ICC corporate and litigation counsel. On October 6, 1972, SEC staff members advised Hogan & Hartson that a criminal reference might be made with respect to Vesco on the basis of the Commission's findings and suggested that the individual respondent might best be represented by independent counsel. Accordingly, in mid-October 1972, Hogan & Hartson asked Paul, Weiss to serve as co-counsel for Vesco in relation to the SEC proceedings, and Paul, Weiss agreed to do so. Having been advised by the SEC of the charges that the Commission proposed to bring in a forthcoming civil action, attorneys associated with Hogan & Hartson, Paul, Weiss, and Willkie, Farr (the latter acting as counsel for IOS) met on October 23, 1972 in New York, and on October 27, 1972 in Nassau, allegedly to establish the groundwork for a cooperative defense effort in the anticipated litigation.

A portion of the October 27 meeting was addressed to the questions of work product and attorney-client privileges raised by a joint defense. The attorneys concluded that, although the relevant law was not entirely clear, the privileges would probably apply to their own discussions and to their interviews of several potential co-defendants, scheduled to be held on the following day. That conclusion was restated at the outset of the October 28 interview sessions.

In addition to the individuals to be interviewed, each at the time a target of the SEC investigation, the October 28 sessions were attended by attorneys for ICC, Vesco, IOS, and Kilmorey Investments Ltd., the latter an IOS affiliate. The interviews had been scheduled to elicit information relating to particular transactions that were among the subjects of the SEC proposed charges.

LeBlanc, whose statements—together with those of Milton Meissner, IOS president and director and an officer and director of several IOS-managed mutual funds—are reflected in Grand Jury Exhibits 1 and 1–A, was apparently not represented by individual counsel at the time of his October 28 interview. Both LeBlanc and Meissner at that time expressed an active concern that their statements might not be preserved from outside exposure. Each proceeded, or continued, with the interview only after receiving repeated assurances from the attorneys present that all disclosures would be privileged on the ground of joint defense.

As noted above, the SEC civil action, based upon the Commission's twenty-month investigation, was filed in this district on November 27, 1972. Either on that date, or shortly before, Hogan & Hartson discontinued its formal representation of Vesco, leaving Paul, Weiss to act as Vesco's sole counsel with respect to the ensuing litigation; nonetheless, both firms agreed that Hogan & Hartson would continue to "shoulder responsibility" for the Vesco defense, at least to the extent that it would share with Paul, Weiss the benefits of Hogan & Hartson's background knowledge of the case, gained by virtue of the latter's long involvement with the SEC investigation.

On December 3 and 4, 1972, attorneys from Hogan & Hartson, Paul, Weiss, and Steptoe & Johnson (the latter firm then acting as co-counsel for IOS) met, in Vesco's Nassau home, with several of the individuals named as co-defendants in the SEC complaint. Among those present at the December 3 and 4 meetings was Stanley Graze. At those meetings, the attorneys again stressed the need for cooperation among the defendants and their counsel. In addition, discussions were had concerning the assignment of counsel for those defendants who were not then individually represented. Recommendations of counsel were made, partially on the basis that the recommended attorneys could "work cooperatively" on the case.

It was apparently at the December 3 meeting that Graze was first asked to make available certain documents for the inspection of co-defendants' counsel. Graze initially agreed to do so, but that cooperation was immediately thereafter "vetoed" by Graze's individual counsel, who had not attended either the December 3 or 4 session. However, Graze's attorney was contacted by counsel for Vesco, who appears successfully to have "engaged in advocacy" on behalf of the purported joint defense effort then in progress. For, on December 5, 1972, Graze agreed to submit to an interview by attorneys from Hogan & Hartson and

Steptoe & Johnson. The resultant statements by Graze are, as indicated above, reflected in the documents marked as Grand Jury Exhibits 2 and 2–A. Within two weeks of that interview, Graze again submitted to questioning by counsel representing other defendants. On that occasion, Graze's individual attorney indicated that he was submitting his client to interview in the presence of additional counsel only because the latter represented other defendants in the SEC action. Requesting a copy of the Hogan & Hartson memorandum that recorded Graze's December 5 statements, Graze's attorney further indicated that additional copies might be distributed to co-defendants and their counsel, but to no others.

As noted earlier, defendant Vesco submitted to further interview by Hogan & Hartson on December 6 and December 22, 1972, in the presence of his Paul, Weiss counsel. In addition, on January 10, 1973, a discussion was had between Vesco and a Hogan & Hartson attorney that bore some relation to the SEC action. The interviews and discussion were recorded, respectively, in Grand Jury Exhibits 4 and 4–A, 5 and 5–A, and 6.

During the same period, interviews were conducted by Hogan & Hartson attorneys with additional co-defendants. It had apparently been agreed among the various counsel representing defendants in the SEC litigation that a division of attorney labor and a sharing of information gathered from co-defendants would be necessary to construction of a defense against the SEC's charges. Hence, the task of conducting interviews was assigned primarily to particular firms; the compilation of transcripts and abstracts was assigned to others; the maintenance of a central repository of relevant documents for reference of all defense counsel was assigned to Paul, Weiss. The question of privilege was repeatedly discussed among the various counsel, sometimes alone and sometimes in the presence of their clients. On several occasions, persons not clearly en-

gaged in the defense against the SEC action were excluded from defense strategy sessions and interviews, for the purpose of preserving confidentiality.

All of the above activities, singly and in combination, bear the markings of a conscious and conscientious joint defense undertaking.

The Government nevertheless maintains, on a variety of grounds, that the particular communications recorded in the contested documents were not in fact made under the impetus of a joint defense. For the reasons indicated below, I conclude that the Government's arguments on the facts are without force with respect to all but one of the Grand Jury Exhibits, *viz.* Grand Jury Exhibit 3.

■ The Government contends that the absence of counsel for LeBlanc and Graze and the presence of individuals other than the interviewing attorneys on October 28, 1972 and December 5, 1972, vitiate the present claims to attorney-client privilege with respect to Grand Jury Exhibits 1 and 1–A and 2 and 2–A. This Court is not persuaded, however, that a contribution to a joint defense need be made by an interested party in the presence of his own attorney. See *Leonia Amusement Corp. v. Loew's, Inc., supra,* at 440–41; *Chahoon v. The Commonwealth, supra,* 62 Va. at 834–43.

■ Nor do I believe that any of the persons who attended the interview of LeBlanc may be characterized as third persons whose presence compromised the confidentiality of those interviews. Although the cases relating to the presence of third parties during conferences between clients and attorneys are not entirely consistent, see, *e. g.,* 8 Wigmore, *supra,* at § 2311 n. 6, that inconsistency need not becloud the issue here. For the rule remains that, where persons confer with counsel for the purpose of advancing their joint defense, the conference is sealed from outside view; as indicated in Part II of this Memorandum, that rule applies whether the parties are technically represented by joint or independent counsel. And, on the basis of the record outlined above, this Court concludes that

the "third" persons present at the LeBlanc interview—all prospective co-defendants—were without exception among the participants in a common defense effort that had begun to take form by the final week of October 1972.

■ Moreover, this Court deems it clear that LeBlanc and Graze themselves understood their interviews to be designed as the implements of a joint defense. LeBlanc's initial reluctance to disclose information peculiarly known to him demonstrates well enough that LeBlanc was not the sort to ignore the dictates of self-interest. His eventual cooperation, this Court concludes, would not have been forthcoming unless LeBlanc himself believed that such cooperation would enure to his own benefit, as well as to that of his potential co-defendants.

Similarly, Graze did not submit to interview until his individual attorney was convinced that it was in the interests of Graze's defense to do so. Graze, like LeBlanc, may not reasonably be viewed as a mere disinterested witness following an impulse to satisfy the "need to know" of others.

The Government urges most strongly that the documents recording Vesco's statements to Hogan & Hartson attorneys in December 1972 and January 1973 cannot have been the products of a joint defense embracing Vesco and ICC because, or so the Government contends, Vesco and ICC at that time stood in adverse positions. To support that contention, the Government points to the several occasions on which Hogan & Hartson and Paul, Weiss attorneys were advised by SEC staff members that ICC might well have grounds for its own action against Vesco on the basis of dealings uncovered by the SEC investigation. Furthermore, the Government argues, the SEC complaint naming Vesco and ICC as co-defendants did not reflect truly common charges against which Vesco and ICC might combine to defend.

Reference to the SEC complaint, however, does not confirm the Government's latter argument. The first paragraph of

the first count alone charged ICC and Vesco, among others, generally with conspiracy to effect a multitude of fraudulent schemes. Although Vesco appears as the central figure in the fifty-three-page SEC complaint, and is often referenced therein without any attendant mention of ICC, the latter is cited in several paragraphs as an instrument or abettor of alleged frauds involving Vesco. Thus, the charges brought against ICC, so far as they extended, were coincident with the charges levelled against Vesco, and to that extent provided a basis for joint defense. Indeed, even if the charges against ICC be deemed to have been derivative only, it may hardly be concluded that ICC would not have sought to bottom its own defense upon Vesco's lack of culpability.

Moreover, if an action by ICC against Vesco might have been foreseeable as early as December 1972 and January 1973, that alone would not have prevented Vesco and ICC from sharing confidential information for the purpose of a joint defense against the immediate SEC action. Those confidences might have placed Vesco at his peril in the event that a private action were eventually instituted by ICC. Nevertheless, assuming *arguendo* that such peril was anticipated and appreciated by Vesco and his counsel, Vesco was entitled to risk it for the sake of strengthening his immediate defense by cooperation from and with ICC and the other co-defendants. That a joint defense may be made by somewhat unsteady bedfellows does not in itself negate the existence or viability of the joint defense.

Furthermore, any other conclusion would oblige this Court to assume that Vesco volunteered information to ICC attorneys in a spirit of wittingly selfless cooperation. I do not think that such abandon of self-interest may reasonably be ascribed to Vesco. This Court declines to be the first to charge Robert Vesco with harboring a hapless naivete.[5]

Nor do I accept the Government's invitation to sift from the contested documents all references that are only arguably related to the SEC complaint. The Court is asked to do so apparently on the theory that such references stood apart from the legitimate subjects of respondents' joint defense and therefore stood beyond the protection of the privilege. I do not believe, however, that the attorney-client privilege may be made to turn upon what would be a fine discrimination—between the relevant and irrelevant—on the part of those engaged in extemporaneous consultation with counsel. There may be instances, of course, when a client's communications patently veer from the subject and spirit of legal consultation; in those instances, with respect to such communications, the attorney-client privilege could not supportably be claimed. But this proviso does not apply to the documents involved in the present case.

None of the above observations, however, can spare Exhibit 3 from the Grand Jury's scrutiny. There is no question that, at the time of Vesco's October 9, 1972 interview, Vesco and ICC were engaged in a joint defense of the classic sort. See *In re Grand Jury Subpoena Duces Tecum,* 391 F.Supp. 1029, 1031 (S.D.N.Y.1975). That circumstance, standing alone, would of course support a claim to privilege. Nevertheless, I must conclude that the requisite confidentiality of Vesco's October 9 statements has not been proved.

■ As indicated earlier in this Memorandum, Vesco and ICC were jointly represented by Hogan & Hartson before the November 27, 1972 filing of the SEC complaint. However, respondents have not asserted, much less demonstrated, that a joint defense embracing additional potential co-defendants was underway—or at least anticipated—as early as October 9. Thus, the presence of Howard Cerny—then a target of the SEC investi-

---

5. That Vesco is not incapable of exercising a considerable degree of precaution is demonstrated by the record since 1973 to date: during this period, Vesco has made himself available to judicial proceedings only when the latter have involved the question of his extradition.

gation and subsequently a defendant in the SEC action—stands in refutation of any claim by Vesco that the October 9 interview was held in confidence. Cerny, a lawyer, had on former occasions acted as Vesco's legal representative in connection with matters unrelated to the SEC investigation. That Cerny stood in the capacity of present counsel for Vesco on October 9, 1972 has not been established by respondents. Significantly, Hogan & Hartson did not then, and cannot now, identify the purpose of Cerny's attendance on October 9. That fact alone casts doubt upon any claim that the interview was conducted under the circumstance of measured and guarded confidentiality. *Cf. In re Horowitz, supra.* Without an affirmative demonstration that Cerny stood as an interested party with respect to the joint defense purpose of the October 9 interview, Grand Jury Exhibit 3 cannot withstand application of the "neutral third party" rule cited above.

■ Nor does the attorney's work-product privilege avail respondents here. The outlines of that privilege, the policies that underlie it, and the persons who may rightfully claim under it need not be retraced or recited now. See, *e. g., Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947); McCormick, *supra,* § 96 at 204–09. This Court need only observe that a document which in the first instance is protected under the work-product doctrine may lose that protection under certain countervailing circumstances. This Court concludes that the unavailability of Vesco and his direct testimony to the Grand Jury constitutes the type of circumstance that warrants disclosure of the instant document. See, *e. g., Hickman v. Taylor, supra,* at 511, 67 S.Ct. 385; *Republic Gear Co. v. Borg-Warner Corp.,* 381 F.2d 551, 557 (2d Cir. 1967); *Transmirra Products Corp. v. Monsanto Chemical Co., supra,* at 578.

## IV.

The present inquiry would be complete but for the following additional facts:

the SEC action commenced in November 1972 was terminated some four months later by a consent decree providing, *inter alia,* for ICC's waiver of "any attorney-client privilege directly or indirectly relating to the issues" in that action. In June 1973, ICC instituted its own action against Vesco, LeBlanc, Graze, and others, in a complaint that in large part tracked the charges that had been brought by the SEC.[6] See *International Controls Corp. v. Vesco,* 490 F.2d 1334, 1340 (2d Cir. 1974). This history, the Government presently urges, dictates the loss of attorney-client privilege in relation to the documents now at issue.

■ The Government's argument rests on a well settled principle cited above. Where two or more persons consult with counsel on the subject of their joint defense or other common legal interest, the confidentiality that gives rise to the attorney-client privilege is perforce limited and, thus, the resultant protection of the privilege is itself a qualified one. As McCormick observes, *supra,* § 91 at 189,

> "it will often happen that the * * * original clients will fall out among themselves and become engaged in a controversy in which the communications at their joint consultation with the lawyer may be vitally material. In such a controversy it is clear that the privilege is inapplicable."

The Government would have this Court conclude that the above principle is dispositive of the present case. For the reasons stated below, the Court arrives at a contrary conclusion.

■ Relevant case law makes it clear that the rule thus described by McCormick, *supra,* squarely applies when former joint clients subsequently face one another as adverse parties in litigation brought by any one of them. See cases cited in McCormick, *supra,* § 91 at 190 n. 8; Annotation, *supra,* at 554 n. 4. The rule may also be invoked in an action brought by or against a successor-in-interest to a former joint client where any

---

**6.** A second action was brought by ICC against Vesco in 1974.

one of the other former joint clients stands as an opposing party in such action. Annotation, *supra,* at 555–56 & nn. 4–7.

■ On the other hand, it has been ruled that the privilege of one joint client cannot be destroyed at the behest of the other where the two have merely had a "falling out" in the sense of ill-feeling or divergence of interests. *State v. Archuleta,* 29 N.M. 25, 217 P. 619 (N.Mex.1923). *Archuleta* involved an attempt to impeach a State witness who had given testimony against several defendants on trial for perjury. The witness and defendants had earlier been joined in a successful defense against a murder charge; the defendants had subsequently been indicted for having given perjured testimony at their murder trial.

On the trial for perjury, the defense attempted to introduce impeaching evidence consisting of statements that had been made by the witness to his counsel and co-defendants during the course of the earlier joint defense effort. The trial court suppressed the evidence on the ground of attorney-client privilege and was affirmed on appeal. Acknowledging the rule that joint conferences allow for only a limited privilege, the appellate court proceeded with the following observations:

> "In this case it is to be remembered that the parties are the state on one side and the appellants on the other in a prosecution for perjury. *The witness under cross-examination * * * is in no sense a party to the proceeding, and is in no legal sense in controversy or litigation with the appellants.* Of course, in a broad sense, a controversy had arisen between the witness and the appellants as to the truth in regard to the murder, with which all were jointly charged. But the controversy or litigation was between a third party and the appellants, and under such circumstances it would seem that the proposed testimony * * * would not fall within the exception to the general rule [that attorney-client

communications are privileged]." (Emphasis added).

■ The Government would undoubtedly argue that, unlike the case of *State v. Archuleta,* ICC is—by virtue of its pending civil actions—"in a legal sense in controversy" with respondents. However, the documents presently under contest are sought to be introduced not in the private litigation between ICC and respondents, but rather, in a third-party proceeding, *i. e.,* before the Grand Jury. On the basis of policy, and in the absence of contrary authority, I conclude that this distinction is critical.

The attorney-client privilege, as noted above, is no less vital to the functioning of a joint defense than it is to the proper course of wholly independent representation. Nevertheless, in at least the one aspect already examined, the law exacts a higher cost for participation in a joint defense. To be sure, confidences shared by joint defendants and their counsel are effectively shielded against outside access. On the law established to date, that shield may be lowered only when the parties once joined assume the stance of opposing parties in subsequent litigation. This restructuring of the parties' rights is a logical incident of their later posture: when they face one another in litigation, neither can reasonably be allowed to deny to the other the use of information which he already has by virtue of the former's own disclosure.

There is no similar justification for requiring the disclosure of a former co-defendant's confidences for use in a third-party proceeding. Indeed, to allow such disclosure would so further erode the privilege's protection as to reduce joint defense to an improbable alternative. How well could a joint defense proceed in the light of each co-defendant's knowledge that any one of the others might trade resultant disclosures to third parties as the price of his own exoneration or for the satisfaction of a personal animus? The attorney-client privilege, carved out to ensure free disclosure between client and counsel, should not thus be whittled away.

Accordingly, this Court rules that Grand Jury Exhibits 1, 1–A, 2, 2–A, 4, 4–A, 5, 5–A, and 6 are within the ambit of the attorney-client privilege and, therefore, that their production cannot be compelled. Grand Jury Exhibit 3 is not protected by the privilege and thus will be made available to the Grand Jury.

So ordered.

## MEMORANDUM AND ORDER

In a Memorandum and Order dated November 13, 1975, this Court ruled that the attorney-client privilege placed nine of ten contested documents beyond the reach of a Special Grand Jury currently investigating possible securities frauds and manipulations involving a broad range of individuals and corporations. Pursuant to Rule 9(m) of the local rules, the United States Attorney has now moved to reargue, requesting that this Court reconsider its decision with respect to four of the documents thus withheld from the Grand Jury.

A full exposition of the background to the above-captioned proceeding appears in the November 13 Memorandum and need not be recited anew. It must be noted at the outset, however, that this Court's earlier ruling turned in large part on the conclusions that 1) the attorney-client privilege attends joint defense communications and 2) the documents at issue were in fact and in law the products of a joint defense.

For purposes of its present motion, the Government does not now challenge the general proposition that the attorney-client privilege applies to communications with the counsel of an actual or a potential co-defendant when those communications are addressed to the advancement of a joint defense effort. The Government nonetheless contends that documents reflecting statements by Norman P. LeBlanc and Stanley Graze at separate interview sessions dated October 28, 1972 and December 5, 1972, respectively, fall outside the ambit of joint defense privilege on the following alleged grounds:

1) It was only subsequent to his October 28 interview that LeBlanc retained the services of independent counsel. Thus, the Government argues in essence that LeBlanc cannot reasonably invoke the attorney-client privilege with respect to statements made by him at a time when he was not formally a "client" and was thus without counsel through whom he might have entered into a joint defense understanding with others.

2) The Government urges that at least one Ninth Circuit decision, *United States v. Friedman*, 445 F.2d 1076 (9th Cir. 1971), has ruled that a client's communications in the absence of his own counsel cannot be shielded by the attorney-client privilege. Because LeBlanc and Graze were interviewed in the absence of their own counsel, the Government contends that the *Friedman* decision disallows application of the privilege to the documents that reflect those interviews.

3) According to the Government, Graze has failed to sustain his burden of proving that his December 5 interview statements were implements of a joint defense undertaking in which he and his counsel were then participants.

4) The Government maintains that the evidence, including that submitted at a hearing addressed to the facts underlying this proceeding, does not support this Court's finding that LeBlanc and Graze made their disclosures to others' counsel "solely in the interests of a joint defense effort." See *In the Matter of a Grand Jury subpoena duces tecum dated November 26, 1974*, M 11–188 (S.D.N.Y. November 13, 1975), at 389. Indeed, the Government asserts, the record is bare of proof that LeBlanc was, at the time of his interview, more than a neutral witness. Thus, according to the Government, there is no evidence that tends to demonstrate that LeBlanc would reasonably have been involved in preparation for his own defense, joint or otherwise, at the time of his October 28 interview.

### I.

The Government's first two arguments need not detain us long. This Court noted in its earlier Memorandum that

"[the attorney-client] privilege is, after all, born of the law's own complexity. The layman's course through litigation must at least be evened by the assurance that [the layman] may, without penalty, invest his confidence and confidences in a professional counsellor. * * * That assurance is no less important or appropriate where a cooperative program of joint defense is helpful or, *a fortiori*, necessary to form and inform the representation of clients whose attorneys are each separately retained." *In the Matter of a Grand Jury subpoena duces tecum dated November 26, 1974, supra,* at 12.

By no means did I then intend to suggest, nor would I now propose, that a formal retainer is the *sine qua non* of the privilege and its protection. To the contrary, where one communicates in confidence with an attorney for the purpose of promoting one's own defense interests, those communications should not be placed beyond the pale of the privilege for want of any technical attorney-client relationship. This, I am convinced, is a logical and even necessary extension of the policy that underlies the privilege.

This conclusion rests beside, if not upon the established principle that preretainer consultations may be subject to the privilege. See 8 J. Wigmore, Evidence § 2304 (McNaughton rev. ed. 1961). Moreover, it would hardly be reasonable to decree that a potential or an actual codefendant cannot "without penalty" sow some of the seeds and reap some of the fruits of a joint defense effort without first enlisting the aid and accompaniment of independent counsel.

As noted above, the Government would have this Court conclude that there is, in at least one Circuit, precedent to the contrary. According to the Government, the Ninth Circuit's decision in *United States v. Friedman, supra,*

squarely "held" that one's communications are not privileged where they issue outside the presence of one's own counsel even if they are addressed to a co-defendant's attorney. But see *Chahoon v. The Commonwealth,* 62 Va. (21 Gratt) 822, 834–43 (1871).

The Government's reading of the *Friedman* opinion is, at best, questionable. In that case, defendants Jacobs and Friedman were charged with conspiracy to obtain and to distribute certain secret grand jury transcripts, as well as with the actual dissemination and use of those transcripts in defending themselves against other charges in an earlier criminal action. Jacobs had been represented in the former action by one Morgan; Friedman had at that time been represented by two other· attorneys. At the later trial, the defendants' former attorneys testified for the Government over both defendants' objections. On appeal, Jacobs and Friedman claimed that the admission of that testimony had violated their respective attorney-client privileges. The Ninth Circuit rejected those claims on several grounds ·that have no relevance here. However, by way of footnote, the Ninth Circuit noted that,

"When called as a surrebuttal witness by Friedman, Morgan did testify to a conversation he had with Friedman in a courthouse during the Friars Club trial. It concerned the discovery of the transcripts; Friedman told Morgan, in effect, that he (Friedman) wanted to talk to Judge Gray about the transcripts. *This was not a privileged conversation. Morgan was Jacobs' lawyer, not Friedman's. And even if the rule of Hunydee v. United States * * * were deemed applicable,* the facts of the conversation· negated confidentiality. Morgan stated: 'And who was within earshot I don't know. But it wasn't in the sense that it was a conference'." 445 F.2d at 1085 n. 4 (citation omitted) (emphasis added).

It is with this footnote observation that the Government proposes to strike down the claim to privilege with respect

to the documents now at issue. This Court must note that the Government has chosen an instrument particularly ill-suited to perform the intended function. There are at least two and perhaps three flaws in *Friedman* as precedent here. In the first place, the Ninth Circuit's references, above, embraced testimony apparently elicited by the Friedman defense itself. Thus, any attorney-client privilege which Friedman might otherwise have been able to invoke was clearly waived. Moreover, the Ninth Circuit's observations in that footnote are scarcely free from ambiguity. Thus, the *Friedman* Court's seeming reservations with regard to the applicability of *Hunydee,* as witness the italicized portion of the passage quoted above, are equally susceptible of two disparate interpretations:

1) that, according to the *Friedman* Court, the *Hunydee* ruling applies—as the Government herein urges—only to communications made to, or at least in the presence of, one's own counsel; or

2) that *Hunydee,* involving privileged communications made in the context of a joint defense, did not in any event apply to the *Friedman* case, where there apparently was no suggestion of a legitimate joint defense undertaking by Jacobs and Friedman at the time the latter communicated to Jacobs' attorney.

Finally, the Ninth Circuit specifically noted the absence of confidentiality in the conversation between Friedman and Morgan. Therefore, the *Friedman* dictum stands solely for the proposition that the privilege does not attach to a non-confidential communication for a non-existent joint defense, where the privilege is waived, a proposition which scarcely needs support. It is difficult to imagine a flimsier lever for the Government's attempt to pry open this Court's previous ruling.

II.

The Government further argues that the record does not support Graze's burden of demonstrating that his interview statements of December 5, 1972 were designed to serve a joint defense of which Graze himself was then a part. The Government concedes that Graze may well have joined in a cooperative defense effort subsequent to December 5. Nevertheless, the Government maintains that a "critical factual issue" was incorrectly resolved in Graze's favor when this Court concluded in its earlier Memorandum that, prior to December 5, 1972, "Graze's attorney was contacted by counsel for [co-defendant] Vesco who appears successfully to have 'engaged in advocacy' on behalf of the purported joint defense effort then in progress." *In the Matter of a Grand Jury subpoena duces tecum dated November 26, 1974, supra,* at 390.

▪ This Court has once again reviewed the record before it. On the basis of that review, I conclude that the evidence offered by way of affidavit and by oral testimony effectively supports this Court's earlier finding that Graze had, with the approval of his counsel, already entered into a joint defense understanding with his co-defendants when he made himself available for interview on December 5, 1972.[1]

---

1. At the hearing on this proceeding, the following testimony was elicited from one of the attorneys involved in the joint defense:

"Q. Did there come a time when you were present at a meeting in which Mr. Graze was also present when the question of cooperation in the defense of the action came up?

A. The only thing I remember on Graze, and it was very early and if it wasn't at this meeting it may have been a telephone call with your office, and I think it was with Ted Ellenoff.

Let me go back. I haven't prepared for this, your Honor, and a lot of this is just coming to me.

I can recall requesting documents for Mr. Graze and that probably was at the first meeting in the Bahamas [on December 3, 1972] * * * and my recollection is that Graze proffered cooperation and that then his lawyer vetoed it or resisted this and I believe I had a conversation with your partner about the fact that it was essential for us to cooperate if we were going to have a meaningful defense on

**398**

## III.

■ In its November 13 Memorandum, this Court found that both LeBlanc and Graze had made their respective disclosures to potential or actual co-defendants' counsel for the sole purpose of advancing their joint defense interests. *In the Matter of a Grand Jury subpoena duces tecum dated November 26, 1974, supra,* at 391. In its brief on the present motion, the Government challenges that finding as follows:

"The present record does not and would not support such a finding in view of the burden of proof on the privilege issue. Since the record could equally support the inference that Le-Blanc and Graze spoke to Hogan & Hartson's attorneys for the purpose of helping Vesco at their own expense and against their own self-interest, the Court should have determined that the 'sole interest' test was not met by Le-Blanc and Graze and thus should have ordered the production of the documents and the testimony of the persons who took the statements. Who knows, Vesco may have told LeBlanc or Graze to talk to Hogan & Hartson counsel for reasons other than any joint defense; maybe Vesco was "setting-up" not only Graze, but LeBlanc, to help Vesco at their own personal expense. These are equally acceptable inferences from the state of the hearing record with respect to Graze and LeBlanc." Government's Brief at 7.

the facts as we then understood them and that we were submitting our client for interview on the basis of joint defense privilege, that we all recognized that the doctrine did not yet have the imprimatur of the United States Supreme Court but that we thought that the better view of the law was that the doctrine did exist and that being so that I hoped that he would submit his client and his client's documents to us on the same basis and, as I recall it, I engaged in advocacy of the performance of our cooperation.

Q. Can you place this telephone call in time?

A. *It was very early because it was before Graze was willing to submit to any kind of discussion.*"

On the basis of the full record, as reconstructed in the November 13 Memorandum, *supra,* at 389–390, this Court had concluded that Graze and LeBlanc were neither unaware of nor indifferent to their respective legal interests. See *In the Matter of a Grand Jury subpoena duces tecum dated November 26, 1974, supra,* at 391. This Court could not then, and cannot now, accept the bare supposition that Graze and LeBlanc might have wittingly sacrificed themselves to the welfare of others. Because the Government has not offered any evidence that would tend to rebut the presumption that Graze and LeBlanc shared in the normal human impulse of self-preservation, this Court's earlier conclusion stands unshaken.

This Court also declines to join in the Government's further speculations. Findings of fact cannot, of course, rest on a base of unreinforced conjecture. Moreover, as this Court had indicated in its earlier Memorandum, *supra* at 389, the availability of attorney-client privilege turned, in this proceeding, on "whether * * * respondents in fact reasonably believed at the time of their meetings and interviews that their statements were being made within the context, and in furtherance, of their joint defense." Thus, whatever ulterior motives co-defendant Vesco might have harbored in his relations with Graze and LeBlanc, *his* undisclosed motives could not have tainted those of Graze and LeBlanc nor deprived them of a privilege to which they were otherwise entitled.

Transcript at 107–08 (emphasis added).
Moreover, in an affidavit submitted by Alfred J. Dougherty, Esq., the following statements are offered:
"7. On December 5, 1972, Robert McLaughlin (of Steptoe and Johnson) and I interviewed Stanley Graze. The purpose of the interview was to provide us with information regarding certain of the transactions mentioned in the SEC's complaint. It was my understanding that Mr. Graze was providing this information as part of the continuing cooperative effort among the defendants. *Mr. McLaughlin agreed, at Mr. Graze's request, to send a copy of amy [sic] memoranda of the interview to Mr. Theodore Ellenoff, who was Mr. Graze's personal counsel.*" (Emphasis added).

In its final arguments, the Government maintains that the record does not provide any basis for this Court's findings that 1) LeBlanc was, at the time of his interview, a "target" of investigation and thus a plausible participant in a joint defense as of October 28, 1972, and 2) LeBlanc was, in any event, involved in a joint defense with each of the persons attending his interview.

The Government's contentions herein are puzzling at the least, in light of the several affidavits, oral testimony, and exhibits bearing upon the above issues. Those sources indicate, *inter alia,* that, by October 28, 1972, the SEC investigation had formally been in progress for more than eighteen months. From the start, the corporate dealings of ICC, IOS, and IOS affiliates had been specific subjects of that investigation. LeBlanc's positions with IOS and his relations with ICC and IOS affiliates made him a natural and perhaps an inevitable target of the SEC inquiry; indeed, less than one month after his October 28 interview, LeBlanc was named an individual defendant in the complaint based upon the SEC investigation. Moreover, the October 28 interview, and the preliminary meetings among counsel on October 23 and 27, followed in the immediate wake of the SEC's disclosure of charges that the Commission proposed to bring in its then-imminent civil action. The attorneys to whom those disclosures were made have, under oath, characterized all those who attended the October 28 interview sessions as persons then understood to be potential co-defendants and counsel for potential co-defendants, and all of those persons were in fact later involved in defense against the SEC action, either as defendants or as counsel. There is no significant evidence to the contrary.

For the reasons set forth above, I conclude that this Court's earlier ruling must stand unaltered. The Government's motion is denied.

So ordered.