**OHIO–SEALY MATTRESS MANUFAC- TURING COMPANY et al., Plaintiffs,**

v.

**Morris A. KAPLAN et al., Defendants.**

**OHIO–SEALY MATTRESS MANUFAC- TURING COMPANY et al., Plaintiffs,**

v.

**Louis C. DUNCAN et al., Defendants.**

**Nos. 76 C 0810, 79 C 2741.**

United States District Court, N. D. Illinois, E. D.

Sept. 17, 1980.

---

Frederick F. Brace, Jr. and William H. Tobin, Sidley & Austin, Chicago, Ill., for plaintiffs.

Howard Koven and Phil C. Neal, Friedman & Koven, Samuel Weisbard, McDermott, Will & Emery, John H. Matheson, Hedlund, Hunter & Lynch, Edward I. Rothschild, Rothschild, Barry & Myers, Max Wildman, Wildman, Harrold, Allen & Dixon, Richard K. Wray, Arnstein, Gluck, Weitzenfeld & Minow, Henry S. Kaplan, Dressler, Goldsmith, Shore, Sutker & Milnamow, Eli E. Fink, Fink, Coff & Stern, Robert H. Joyce, Seyfarth, Shaw, Fairweather & Geraldson, Albert E. Jenner, Jr., Jenner & Block, Michael W. Coffield and Gregory A. Friedman, Coffield, Ungaretti, Harris & Slavin, Chicago, Ill., Fred B. Miller, Portland, Or., Louis B. Garippo, Thomas J. Campbell, Winston & Strawn, James E. Hastings, Chadwell, Kayser, Ruggles, McGee & Hastings, Stanley B. Block, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge.

These cases[1] come before the Court for review of the Report and Recommendations issued by Magistrate Cooley on June 9, 1980, with respect to ten separate motions filed by the various parties. Pursuant to 28 U.S.C. § 636(b)(1), the parties have filed comments on and objections to certain of the magistrate's findings and conclusions. Upon examination of the magistrate's recommendations and the arguments posed by the parties,[2] the Court adopts in full Magistrate Cooley's recommendation that (1) Haas' motion for a more definite statement, and as such should be granted; and (2) defendants' motion for summary judgment as to Count V in the 1976 case be denied. The Court affirms in part and reverses in part the magistrate's finding that (1) the

---

1. Hereinafter, *Ohio-Sealy Mattress Manufacturing Co. v. Kaplan*, 76 C 0810 (N.D.Ill.) will be referred to as the "1976 case;" *Ohio-Sealy Mattress Manufacturing Co. v. Duncan*, 79 C 2741 (N.D.Ill.) will be referred to as the "1979 case."

2. Inasmuch as the parties have expressed differing views on the standard of review to be applied to the instant motions, the Court deems it appropriate to clarify its role in reviewing the recommendations of Magistrate Cooley in the 1976 and 1979 cases. As to the motions that involve discovery matters which have been committed to the discretion of Magistrate Cooley, the Court will reconsider the magistrate's findings only if they are shown to be "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A). As indicated in *United States v. Canada*, 440 F.Supp. 22, 24 (N.D.Ill.1977), "[o]ne of the primary goals of the Magistrate's Act was to 'cull from the overgrowing workload of the U.S. district courts matters that are more desirably performed by a lower tier of judicial officers.'" Section 636(b)(1)(A), as well as Magistrate Rule 1.01C(3) of the Local Rules for the Northern District of Illinois, empower a trial court to commit to a magistrate for hearing and ruling all pretrial matters which do not involve ultimate decisions in the litigation. In this case, the parties extensively briefed the discovery issues before the magistrate. Upon consideration of these arguments and the relevant documents, the magistrate made a number of findings. Were the Court to review each of these findings de novo, both the authority of the magistrate and the underlying purposes of the Magistrate's Act would be subverted. This would be particularly unfortunate in the instant causes given the Court's respect for the professional performance of Magistrate Cooley, as exhibited by his excellent work product in these cases. Accordingly, the Court will review the discovery matters presented herein—as well as all future pretrial findings by the magistrate which do not implicate ultimate issues in the litigation—under the "clearly erroneous or contrary to law" standard.

Section 636(b)(1)(B), on the other hand, permits referral of dispositive motions to a magistrate only for the purpose of soliciting recommendations. Thus, the dispositive—or substantive—motions presented herein or in future recommendations issued by Magistrate Cooley will be subject to de novo review upon timely request by any of the parties.

motion by certain defendants in the 1976 case seeking an order precluding disclosure and use of certain documents in the possession of Joseph V. Moffit, Jr., Lloyd Rosenfeld, and Walter Hertz should be denied; (2) the motion by Joseph V. Moffit for a protective order permitting him to answer certain deposition questions should be granted; (3) plaintiffs' motion in the 1976 case to compel Morris J. Coff to answer certain deposition questions should be granted; and (4) a date certain be set for defendant Sealy to specify whether Professor Peter O. Steiner will be retained as an expert.[3] Because defendants and Coff now have raised the work-product doctrine in support of their positions, the Court remands these motions to Magistrate Cooley for further consideration in light of the work-product doctrine.

I. *Haas' Motion For Judgment On The Pleadings—1976 Case*

■ Although Haas throughout has labeled his motion as one for judgment on the pleadings, the magistrate concluded that in fact it was more akin to a motion for a more definite statement. Upon review of the arguments presented by Haas to the magistrate and herein, the Court agrees.

In seeking judgment on the pleadings as to Counts I and V,[4] Haas argues in large measure that the complaint simply is ambiguous in its allegations of conduct attrib-

utable to specific persons or entities. The magistrate agreed, as he characterized the complaint as "woefully deficient" in providing Haas with notice of his alleged wrongful conduct. Without more, however, this would warrant an order requiring a more definite statement rather than an entry of judgment in favor of Haas. Thus, Haas also argues that plaintiffs in Count I have failed to allege the necessary elements of a conspiracy between Haas and the other defendants. Similarly, Haas, in addition to decrying the general ambiguity of Count V, argues that the count fails to connect him with any wrongdoing. At bottom, however, both these arguments are but specific applications of Haas' more general contentions concerning the ambiguity of the complaint. Until there is a clearer statement of the essential facts in the complaint as they relate to Haas, it is impossible to determine as a matter of law whether Haas is entitled to judgment.

Thus, the Court believes that inasmuch as Haas' substantive arguments as to the complaint are based in large measure on the ambiguity therein, the appropriate course is to treat his motion as one for a more definite statement. *Cf.* 2A Moore's Federal Practice ¶ 12.08 at 2285 (2d ed. 1979). Treated as such, the Court adopts the magistrate's recommendation that the motion be granted. For the reasons stated in note 3, *supra*, however plaintiffs' filing of a con-

---

**3.** Two other motions considered by Magistrate Cooley do not require detailed discussion. Although plaintiffs' quarrel with certain of the magistrate's characterizations of the amended complaint in the 1979 case, they do not object to his recommended order which would grant defendants' motion for a more definite statement. Indeed, the plaintiffs have attempted to comply with the recommended order by filing a more definite statement. However, that statement denominates the 1976 and 1979 cases as consolidated. After plaintiffs filed their more definite statement, the Court in addressing a separate set of motions denied plaintiffs' motion to consolidate the 1976 and 1979 cases. Thus, in order to avoid any possible confusion as to the relationship between the two cases, the Court strikes plaintiffs' consolidated more definite statement and orders that plaintiffs file a separate statement in the 1979 case on or before September 29, 1980.

The magistrate also recommended dissolution of the "injunction" which has prohibited use of the documents subject to the attorney-client privilege claim during the pendency of the motions. Whether this prohibition is to be characterized as an injunction or, as the defendants argue, merely a protective order, need not be addressed at this time in view of the Court's order remanding the case to the magistrate for consideration of the work-product question raised by defendants in this Court. On remand, the magistrate should clearly state his reasons for characterizing the prohibition as an injunction.

**4.** Inasmuch as the Court's opinion of August 1, 1980, disposed of Counts II–IV, *Ohio-Sealy Mattress Manufacturing Co. v. Kaplan,* 90 F.R.D. 11 at 20 (N.D.Ill.1980), the Court need not address defendant Haas' contentions with respect to those counts.

solidated more definite statement for the 1976 and 1979 cases has been stricken. Accordingly, the plaintiffs are ordered to file a more definite statement in the 1976 case on or before September 29, 1980.[5]

## II. *Defendants' Motion For Summary Judgment—1976 Case*

Defendants' motion for summary judgment on Count V, a shareholder derivative claim, is premised on their view that plaintiffs have a significant conflict of interest with the corporation and its other shareholders which renders them inadequate representatives under Fed.R.Civ.P. 23.1. The magistrate found no inconsistency between the derivative count and plaintiffs' other individual claims against Sealy and its licensee-directors, since both are based upon the same corporate conduct and both seek to accomplish the same end—to compel Sealy to conform with the antitrust laws. The magistrate also concluded that plaintiffs' competence and zeal in earlier antitrust litigation attested to the adequacy of plaintiffs as representatives on the derivative count. For these reasons, the magistrate recommended that defendants' motion for summary judgment be denied. Upon de novo review of this issue, the Court adopts the magistrate's recommendation.

The Court recognizes that a critical element to be considered in determining the adequacy of a particular representative in a derivative action "is whether plaintiff's interests are antagonistic to those he is seeking to represent." Wright & Miller, 7A Federal Practice and Procedure ¶ 1833 at 393 (1972 ed.). The Court also recognizes that it is defendants who must bear the burden of showing "that a serious conflict exists and that plaintiff could not be expected to act in the interests of the other shareholders because doing so would harm his other interests." *Id.* at 394. In their memoranda filed in this Court, defendants have asserted six arguments in support of their contention that plaintiffs are inadequate representatives on the derivative count.[6] The Court, however, finds all of these arguments unpersuasive.

First, defendants contend that because plaintiffs, who represent only 0.7% of the shares of Sealy, are suing in the derivative count defendants who own more than 90% of Sealy shares, the action is not in the best interests of the corporation or shareholders. However, in determining whether a plaintiff is an adequate representative, the term "interests of the shareholders" at times "must necessarily refer to a minority or other definable group of shareholders with interests similar to plaintiff because otherwise a derivative suit would be logically impossible whenever the interests of the majority of stockholders coincided with the defendants." 3B Moore's Federal Practice ¶ 23.1.16[3] at 23.1–59 (2d ed. 1979); *Nolen v. Shaw-Walker Co.*, 449 F.2d 506, 508–509 n.4 (6th Cir. 1971). Thus, plaintiffs' small holding of Sealy shares does not in itself suggest a conflict of interest so as to render them inadequate representatives.

Second, Sealy contends that the derivative suit will be ineffective in achieving one of plaintiffs' stated purposes—to impose liability on the directors who have directed the alleged illegal corporate activity. Defendants reason that any recovery on the derivative count will be paid to Sealy, rather than to the plaintiff shareholders. Thus, all shareholders will benefit indirectly from the monies paid to the corporation. Since the licensee-directors, who would be the parties liable for any judgment, also own more than 90% of the shares of Sealy, they too

---

**5.** At that time, rather than filing merely a document listing certain allegations with more particularity, plaintiffs should submit an amended pleading which reflects not only the more definite statement but the changes required by the Court's August 1 opinion as well.

**6.** Defendants have not raised the argument that because the individual and derivative claims derive from the same subject matter, plaintiffs

are inadequate representatives in the derivative suit. This theory has been rejected by other courts, *G. A. Enterprises, Inc. v. Leisure Living Communities, Inc.*, 517 F.2d 24, 27 (1st Cir. 1975); *Robinson v. Computer Servicenters, Inc.*, 75 F.R.D. 637, 643 n.7 (N.D.Ala.1976), and would be unpersuasive even had defendants raised it herein.

would benefit from any derivative judgment paid to Sealy. Accordingly, defendants argue that the lion's share of any monies paid by the licensee-directors in satisfaction of a judgment merely would be funneled back to them indirectly by reason of their status as Sealy shareholders. Accepting the foregoing, the Court does not believe that this argument supports the conclusion that plaintiffs are inadequate representatives; it merely tends to establish that plaintiffs will not be able to obtain all that they seek via the derivative action. This latter point would be true irrespective of who filed a derivative action on behalf of the shareholders. The Court does not believe that the dual status of the defendants as directors and shareholders of Sealy should insulate them entirely from derivative lawsuits.

Third, defendants argue that plaintiffs will not vigorously pursue the derivative claim because a large award payable to Sealy would be against their interest, since the plaintiffs compete in the bedding market with Sealy and its licensees. In this case, however, the factual bases of the individual and derivative claims are the same. Thus, any lack of vigor displayed by plaintiffs in prosecuting the derivative claim would redound to their detriment in the pursuit of their individual claims. For this reason, it is unlikely that plaintiffs would not litigate to the fullest the derivative claim. Nor does the Court believe that the possibility of a settlement of the derivative claim that compromises the interests of the shareholders is likely. The Court observes that derivative claims may be settled only with judicial approval. This review of any prospective settlement should be adequate to ensure that plaintiffs do not compromise the interests of the shareholders in order to further their individual claims.[7]

Fourth, defendants make the related argument that if plaintiffs prevail both on the individual and derivative claims, they will seek enforcement of the individual claims before pursuing payment of the derivative claim. This argument assumes that defendants will lack the resources to satisfy both judgments, an assumption that cannot be made at this time. Moreover, the Court in exercising its supervision over the conduct of the derivative litigation can insure an equitable distribution of proceeds if plaintiffs should prevail on their individual and derivative claims and if defendants lack the resources to satisfy fully both the individual and derivative judgments. Therefore, this argument is insufficient to support the conclusion that plaintiffs are inadequate representatives.

Fifth, defendants charge that plaintiffs' conflict of interest already has manifested itself in their decision to settle the derivative claims against defendants Moffit, Rosenfeld, and Hertz in exchange for their assistance in the individual litigation. However, defendants fail to note that plaintiffs dismissed the individual as well as the derivative claims against these three defendants. Moreover, the information which plaintiffs have sought to obtain by their agreements with Moffit, Rosenfeld, and Hertz would be of assistance both in the derivative and individual claims. Indeed, the Court does not believe that these settlement agreements would have been approved had Judge McMillen believed that the interests of the shareholders were being compromised. Thus, the Court rejects this argument as grounds for finding plaintiffs to be inadequate representatives.

Sixth, defendants assert that plaintiffs have no interest in protecting the interests of Sealy, but rather are using the derivative suit merely as a strategic tool by which they can further their interest in the indi-

---

7. In *G. A. Enterprises*, the court suggested that this was an inadequate safeguard since "a court's ability to oversee complex litigation and understand all its nuances is limited by its many other duties." 517 F.2d at 27. In that case, however, the task of oversight was complicated by the plaintiff's involvement in several separate actions in different courts. Here, the various claims by and against plaintiffs all are in this Court. Accordingly, while the Court recognizes the difficulty of exercising oversight in complex litigation, it does not believe this to be an impossible task under the circumstances of this case.

vidual claims. Specifically, defendants contend that plaintiffs are using the derivative claim to strip Sealy of the attorney-client privilege. As is discussed *infra*, however, the mere existence of a derivative claim does not entitle a plaintiff to pierce the attorney-client privilege. Both parties recognize, and the Court agrees, that the privilege may give way only upon a showing by plaintiff of "good cause." *See e. g. Garner v. Wolfinbarger*, 430 F.2d 1093, 1101–1104 (5th Cir. 1970), *cert. denied*, 401 U.S. 974, 91 S.Ct. 1191, 28 L.Ed.2d 323 (1971). If plaintiffs can show that good cause exists for them to obtain discovery of otherwise privileged material, the Court does not see how that requires the conclusion that plaintiffs are inadequate representatives on the derivative claim.

The Court is aware that the juxtaposition of the individual and derivative counts, like many aspects of the *Sealy* cases, is unusual to say the least. Plaintiffs, who have filed individual antitrust claims against Sealy and its licensee-directors, seek to represent the interests of Sealy in the derivative count against the licensee-directors. Furthermore, since the licensee-directors also control more than 90% of the shares of Sealy, the derivative count against the licensee-directors is at the same time a suit against the vast majority of the shareholders of Sealy. What this suggests is that the derivative count might be only marginally effective in placing liability on the directors of Sealy, since as shareholders they well may share in any judgment awarded the corporation. Defendants' arguments, however, have failed to identify any convincing grounds for concluding that plaintiffs' interest in their individual claims is in irreconcilable conflict with their maintenance of the derivative claim. Accordingly, defendants' motion for summary judgment on Count V is denied.[8]

8. In so holding, the Court observes that defendants' motion was based solely on the alleged inadequacy of plaintiffs' representation in the derivative action. Although defendants' reply brief in this Court includes a three-page appendix presenting its view on the merits, at no time have defendants relied upon the merits in support of their summary judgment motion. Nor have plaintiffs been accorded an opportu-

## III. *Attorney-Client Privilege—1976 Case*

As the result of a settlement agreement with defendants Moffit, Rosenfeld, and Hertz, plaintiffs sought to obtain certain documents in their possession. Defendants have objected to production and use of 31 different documents on the ground of attorney-client privilege.[9] The magistrate concluded that most of these documents were not privileged inasmuch as they were communications from counsel to their clients which revealed no confidential information received from the clients. The magistrate found that certain other documents were privileged, but that the privilege had been waived since the documents reflected confidences only of the settling defendants and not those made in the context of the joint defense effort by all the defendants. As to the remaining documents which the magistrate considered privileged, he ruled that the privilege could be pierced due to the "ongoing fraud" doctrine and the pendency of the derivative count. Finally, the magistrate found that Michigan-Sealy, a defendant herein who has sought to file a cross-claim against Sealy, could obtain the documents in question if it became an adverse party to Sealy in this or subsequent litigation. Magistrate Cooley further ruled that plaintiffs herein were entitled to any information obtained by Michigan-Sealy. Each of these rulings of the magistrate will be considered in turn, with the standard of review being the "clearly erroneous or contrary to law" test set forth in 28 U.S.C. § 636(b)(1)(A).

### A. Communications From Attorney To Client

In ascertaining the existence of the attorney-client privilege, the Seventh Circuit in

nity to respond on the merits. Accordingly, the Court today holds only that summary judgment on Count V cannot be granted to defendants on the claim of inadequacy of representation.

9. There are a total of 57 documents in all, but many of the same documents are in the possession of more than one of the settling defendants.

*Radiant Burners, Inc. v. American Gas Association*, 320 F.2d 314, 319 (7th Cir.) (en banc), *cert. denied*, 375 U.S. 929, 84 S.Ct. 330, 11 L.Ed.2d 262 (1963), adopted the Wigmore test:

> (1) Where legal advice of any kind is sought, (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence, (5) by the client, (6) are at his instance permanently protected, (7) from disclosure by himself or by the legal adviser, (8) except the privilege may be waived.

This formulation presupposes that communications for which privilege is claimed will emanate directly from the client. Neither the Seventh Circuit nor the district courts therein appear to have addressed the issue of when communication from a lawyer to a client will be deemed privileged. In other federal courts across the country, however, there have been two distinct approaches to this question.

One line of cases holds that once the attorney-client privilege is established, virtually all communications from an attorney to a client, even if unsolicited, are subject to the privilege:

> While certain advisory communications from the attorney to the client were not in direct response to a client request, it is evident that an ongoing attorney-client relationship existed. Moreover, the attorney would have been remiss in his duties were he not to keep his client informed of pertinent legal developments with respect to the matters for which his services were obtained.

*Jack Winter, Inc. v. Koratron Company, Inc.*, 54 F.R.D. 44, 46 (N.D.Cal.1971); *Hercules, Inc. v. Exxon Corp.*, 434 F.Supp. 136, 144–145 (D.Del.1977); *Burlington Industries v. Exxon Corp.*, 65 F.R.D. 26, 37 (D.Md.1974). These cases appear to be premised in part on the assumption that any statement by a lawyer is likely to reveal, at least indirectly, a confidential communication by a client.

Other courts, however, have extended the privilege to statements from an attorney to his client only if convinced that the statements in fact do reveal, directly or indirectly, the substance of a confidential communication by the client. *Matter of Fischel*, 557 F.2d 209, 211 (9th Cir. 1977); *In Re Ampicillin Antitrust Litigation*, 81 F.R.D. 377, 388 (D.D.C.1978); *Herbert v. Lando*, 73 F.R.D. 387, 398 (D.N.Y.1977); *SCM Corp. v. Xerox Corp.*, 70 F.R.D. 508, 522 (D.Conn. 1976); *United States v. International Business Machine*, 66 F.R.D. 206, 215 (S.D.N.Y. 1974). These cases suggest that even legal opinions rendered by an attorney are not privileged *per se*, but rather are protected only to the extent they are based upon, and thus reveal, confidential information furnished by the client. *Lando, id.*

Although the question has not been addressed by the Seventh Circuit, it seems that the latter approach best comports with the general principles governing attorney-client privilege as enunciated in this Circuit. The basis of the privilege is the policy of promoting the free flow of communication between a client and his attorney. To accomplish this, the privilege has been held to attach when a client has "a reasonable expectation of privacy and confidentiality with regard to disclosures made during the course of consultation with his attorney." *In the Matter of Carl Walsh*, 623 F.2d 489 at 492 (7th Cir. 1980); *In Re January 1976 Grand Jury*, 534 F.2d 719, 728 (7th Cir. 1976). However, the court in *Radiant Burners* warned that since the privilege is an obstruction to full and free discovery, "it ought to be strictly construed within the narrowest possible limits consistent with the logic of the principle." 320 F.2d at 323. A rule conferring privileged status upon a broad range of communications from the attorney to the client would ignore *Radiant Burners'* caveat. Thus, communications from the attorney to the client should be privileged only if it is shown that the client had a reasonable expectation in the confidentiality of the statement; or, put another way, if the statement reflects a client communication that was "necessary to obtain informed legal advice [and] which might not have been made absent the privilege." *Walsh*, at 494.

Since the magistrate applied this standard in determining whether the documents were privileged, *Report and Recommendation in 76 C 0810* at 24 (June 9, 1980), his conclusions are not contrary to law. Nor, with one exception,[10] does the Court believe that it was already erroneous for the magistrate to find that these communications from counsel to their clients were unprivileged.[11] Many of the documents reveal matters of public record that could have been discovered by other means. None of the documents reveal any information that even approaches a breach of the confidentiality necessary for the proper functioning of the attorney-client relationship. Accordingly, the Court affirms Magistrate Cooley's conclusion as to these documents.[12]

## B. Joint Defense Privilege

 Where two or more persons jointly consult an attorney concerning a mutual concern, "their confidential communications with the attorney, although known to each other, will of course be privileged in a controversy of either or both of the clients with the outside world...." C. McCormick, *Law of Evidence,* § 95 at 192 (1954 ed.); *United States v. McPartlin,* 595 F.2d 1321, 1336 (7th Cir. 1979); *Matter of Grand Jury Subpoena,* 406 F.Supp. 381, 387–389 (S.D.N.Y.1975). Moreover, the joint defense privilege cannot be waived without the consent of all parties to the defense, except in the situation where one of the joint defendants becomes an adverse party in a litigation. *Grand Jury Subpoena, id.* at 393–394.

In considering this aspect of defendants' motion, the magistrate concluded that part of Moffit document number 9 was subject to the joint defense privilege. However, he also found that Moffit document number 10 and Rosenfeld document number 10 were privileged, but that since these documents were not part of the joint defense, the privilege had been waived by the settlement entered into by Moffit and Rosenfeld. Moreover, in an alternative ruling on Moffit document number 8, the magistrate similarly concluded that any privilege attaching to this document was waived since the document was not part of the joint defense effort. As to the documents in which the magistrate found the joint defense privilege inapplicable, the Court believes that an inappropriate legal standard was applied. The question in determining whether a document is part of the joint defense effort is not the party to whom the document was directed, but rather whether the document reflects material it is part of the joint defense effort. That these documents included communications from settling defendants to their individual attorneys does not alter the fact that the documents reflect the joint defense effort engaged in by defendants. For this reason, the settling defendants cannot unilaterally waive the attorney client privilege that attaches thereto. Thus, the Court reverses the magistrate's ruling as to the existence of the joint defense privilege on Moffit document numbers 8 and 10, as well as Rosenfeld document number 10.

## C. Ongoing Fraud Exception

 It is well established that the attorney-client privilege may be pierced "when the client uses the attorney-client relationship to engage in ongoing fraud rather than to defend against past misconduct." *In Re Special September 1978 Grand Jury (II),* 640

---

10. The magistrate held that Moffit Document Number 8 was not privileged. However, it is clear that at least the Mailgram attached includes statements by counsel which reflect confidential communications by one of the defendants. Thus, the Court reverses the magistrate's ruling on this document, finding it to be privileged.

11. Falling within this category are:
Moffit Documents Numbers 1–7, 11–13, 15–17

Rosenfeld Documents Numbers 2–6, 8–9, 14–16
Hertz Documents Numbers 4–8, 10–21

12. In addition, the Court finds no error in Magistrate Cooley's finding that the following documents are not subject to the privilege:
Moffit Document Numbers 9 (in part) and 14 (in part)
Rosenfeld Documents Numbers 1, 7, 11–13, 17–19
Hertz Documents Numbers 1–3, 9

F.2d 49 at 59 (7th Cir. 1980). Under this rule, the attorney is required to advise his client "to cease any unlawful activities that the lawyer perceives are occurring." *United States v. Hodge and Zweig*, 548 F.2d 1347, 1355 (9th Cir. 1977). Moreover, even if the attorney is unaware of any impropriety, the privilege is waived if the client has obtained the attorney's unwitting assistance in perpetrating the fraud. *In Re Westinghouse Electric Corp.*, 76 F.R.D. 47, 57 (W.D.Pa.1977). However, before the privilege may be deemed waived, there must be prima facie evidence that the alleged fraud has some foundation in fact. *September 1978 Grand Jury*, at 60.

██ The magistrate concluded that plaintiffs had established a prima facie case as to all documents generated prior to the verdict in *Ohio-Sealy Mattress Manufacturing Co. v. Sealy, Inc.*, 71 C 1243 (N.D.Ill.), as well as post-verdict documents relating to plaintiffs' claims under section 8 of the Clayton Act, 15 U.S.C. § 19. Although the magistrate did not explain the bases for his conclusions, it appears that he accepted plaintiffs' characterization of defendants' pre- and post-verdict conduct, as well as plaintiff's interpretation of the jury verdict in the 1971 case. The Court, however, believes these characterizations to be clearly erroneous and contrary to law.

Plaintiffs characterize defendants' pre-verdict conduct as one continuous effort to "get around" the Supreme Court decision in *United States v. Sealy*, 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967), and retain their system of territorial allocation. As evidence of this, plaintiffs point to the restrictive characteristics of the Sealy license agreement in existence at the time, and the jury verdict finding Sealy in violation of the antitrust laws. For three reasons, these arguments are insufficient to establish a prima facie case. First, the attempt of Sealy to maintain the "perceived benefit of its former system [to the maximum extent] the Department of Justice and the courts would allow in light of the Supreme Court decision" is not in and of itself

illegal. *Ohio-Sealy Mattress Manufacturing Co. v. Sealy, Inc.*, 585 F.2d 821, 826 (7th Cir. 1978), *cert. denied*, 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979). To the contrary, it reflects an attempt to "get around" the Supreme Court opinion while remaining in accordance with its legal mandate. Second, the license agreement has not been found violative of the antitrust law in all respects. As the Seventh Circuit recognized, the jury verdict conclusively established only that at least one of Sealy's first-refusal acquisitions violated antitrust laws. *Id.* at 844. Involvement of lawyers in drafting the right of first refusal provision is insufficient to establish a prima facie case that the lawyers were parties, either knowingly or unwittingly, in the particular exercise of that right that was illegal. Finally, the Court notes that the documents at issue in these motions pertain solely to post-verdict conduct. As the Court in *September 1978 Grand Jury* recognized, the ongoing fraud exception lifts the attorney-client privilege only with respect to documents relevant to the fraudulent conduct. At 61 n.16. Thus, even were a prima facie case of pre-verdict ongoing fraud established, it would not provide a basis for overriding any privilege which attaches to the documents in question herein.

As to the documents relevant to the section 8 claim, plaintiffs argue that defendants knew the section 8 claim was meritorious and yet refused to confess or alter their corporate structure immediately. Rather, plaintiff asserts that defendants delayed any change in the structure until they could devise a way to maintain control over matters such as territorial allocation despite the change in directorships. The Court believes that plaintiffs, as well as the magistrate in adopting plaintiffs' view, have exaggerated defendants' conduct in this regard. The documents, fairly read, do not reflect defendants' view that they were "in violation" of section 8; rather, they reflect the legal assessment of their chances of prevailing on that claim. That they viewed these chances as slight cannot be read as a confession of

guilt.[13] Nor can their lengthy consideration of whether to change the system of directorship, what would be the best alternative, and the timing of any change with respect to its impact on this litigation be viewed as prima facie evidence of ongoing fraud.

Accordingly, the Court reverses the magistrate's ruling that plaintiffs have established a prima facie case of ongoing fraud so as to deprive defendants of the attorney-client privilege.

### D. Derivative Claim Exception To The Privilege

 As stated earlier, a plaintiff in a derivative suit may upon a showing of good cause strip the corporation and its directors of their attorney-client privilege. *Garner v. Wolfinbarger*, 430 F.2d 1093, 1104 (5th Cir. 1970), *cert. denied*, 401 U.S. 974, 91 S.Ct. 1191, 28 L.Ed.2d 323 (1971). The court in *Garner* identified nine factors relevant to a determination of good cause:

1) the number of plaintiff shareholders and percentage of shares they represent;

2) the bona fides of the plaintiff shareholders;

3) the nature of the shareholders' claim and whether it is obviously colorable;

4) the necessity or desirability of the shareholders' obtaining the information, and its availability from other sources;

5) whether the alleged wrongdoing is criminal or merely illegal;

6) whether the communication relates to past or prospective conduct;

7) whether the communication concerns advice about the litigation itself;

8) whether the communication is specifically identified;

9) the risk of revealing trade secrets of defendants or other information in which they have an interest of confidentiality for different reasons.

*Id.* The burden of establishing good cause is upon the party seeking to pierce the attorney-client privilege. The magistrate, without discussion, held that good cause had been established. Upon review, the Court finds this conclusion clearly erroneous and contrary to law.

 First, and most important, the information sought in large measure pertains to prospective conduct rather than past conduct, and reflects advice concerning this very litigation. The importance of these factors is particularly evident in *Panter v. Marshall Field & Co.*, 80 F.R.D. 718 (N.D.Ill. 1978). In that case, the court found good cause to lift the privilege as to documents containing information about defendant's past conduct in response to acquisition offers, including the offer that gave rise to that litigation. However, the court declined to permit the derivative plaintiff to pierce the privilege in order to obtain documents which pertained to the litigation itself. *Id.* at 724. Similarly, in *Cohen v. UniRoyal*, 80 F.R.D. 480, 484–485 (E.D.Pa. 1978); *In Re Transocean Tender Offer Securities Litigation*, 78 F.R.D. 692, 696–697 (N.D.Ill.1978); *Garner v. Wolfinbarger*, 56 F.R.D. 499, 503–504 (S.D.Ala.1972); *Bailey v. Meister Brau, Inc.*, 55 F.R.D. 211, 213–214 (N.D.Ill.1972), the courts in finding good cause to pierce the privilege observed that the information sought pertained to past conduct and did not reveal advice rendered by counsel in that litigation. Thus, the Court believes that this ground alone provides an ample basis for refusing to pierce the privilege.

However, this conclusion is further bolstered by several of the other factors enunciated in *Garner*. Plaintiffs in this action represent fewer than 1% of Sealy's shares. Moreover, the unusual posture of this litigation provides defendants with an independent interest in preventing plaintiffs from obtaining this information. The information that plaintiffs would obtain by virtue of their representation of Sealy in the de-

---

13. The Court believes that in the whole context of all the statements reflected in the documents the single statement contained in Rosenfeld·

Document Number 11 ("Section 8 is very narrowly construed and 'we are in violation' ") is not of determinative significance.

rivative action could be used to the corporation's detriment in the individual litigation between plaintiffs and Sealy.

Thus, the Court concludes that plaintiffs have failed to satisfy the good cause test set forth in *Garner.* Accordingly, the magistrate's ruling that plaintiffs could pierce the attorney-client privilege by virtue of the derivative suit is reversed.

### E. Michigan-Sealy's Entitlement To The Documents

Defendants have objected to the magistrate's ruling granting Michigan-Sealy access to the documents in question on essentially two grounds. First, they argue that Michigan-Sealy, despite its attempt to file a cross-claim, was not an adverse party entitled to lift the joint defense privilege since there was no *subsequent* litigation between the parties. In support of this argument, defendants seize upon statement in *In Re Grand Jury Subpoena,* 406 F.Supp. 381, 394 (S.D.N.Y.1975), that the joint defense privilege may be waived when the parties "assume the stance of opposing parties in subsequent litigation." Whether the pendency of a cross-claim would satisfy this requirement has been rendered moot in this case by events transpiring subsequent to the magistrate's order and the briefs in response thereto. In its August 1, 1980, opinion, this Court denied Michigan-Sealy's motion to file a cross-claim against Sealy. *Ohio-Sealy Mattress Manufacturing Co. v. Kaplan,* at 20–21 (N.D.Ill.1980). As a result of that order, Michigan-Sealy now has filed lawsuit against Sealy. *Sealy Mattress Company of Michigan, Inc. v. Sealy, Inc.,* 80 C 4676 (N.D.Ill.). Thus, the parties now face each other in subsequent litigation.

■ Second, defendants argue that even if the subsequent litigation exception applies, Michigan-Sealy is entitled only to those documents reflecting communications between Michigan-Sealy and Sealy. In defendants' view, the other joint defendants not named in the subsequent litigation could continue to assert the joint defense privilege as to any communications in which they participated. This rule, however, would vitiate the subsequent litigation exception in those instances where there are a number of parties participating in a joint defense. By definition, the defense effort is joint among *all* defendants; thus, there are likely to be few documents which reflect communications solely between two parties who later become adverse litigants. No doubt it was for this reason that the court in *Grand Jury Subpoena* noted that the exception applies where "*any one* of the former clients stands as an opposing party in such action." 406 F.Supp. at 393–394. The court therein suggested no limitation on the exception such as that offered by defendants, and the Court finds it inappropriate to create such an exception.

■ The magistrate also concluded that plaintiffs are entitled to any documents which Michigan-Sealy obtains under the subsequent litigation exception. The magistrate reasoned that these documents would also be discovery-relevant to plaintiffs, and that production of the documents to plaintiffs would be in accord with the Seventh Circuit rule of narrowly confining the scope of the attorney-client privilege to its essential purpose. The Court, however, believes that the magistrate's conclusion is based on an erroneous premise. The subsequent litigation exception is based on the view that a joint defendant who later becomes adverse cannot "reasonably be allowed to deny each other the use of information which he already has by virtue of the former's own disclosure." *Grand Jury Subpoena,* 406 F.Supp. at 394. It is quite another matter, however, to make this information available to an adverse party who never participated in a joint defense. As to such a party, there is a reasonable expectation of confidentiality that cannot be lifted merely because another party in a separate litigation has obtained documents.

Accordingly, the Court affirms the magistrate's ruling that Michigan-Sealy is entitled to pierce the attorney-client privilege as to the documents at issue herein. However, any documents that ultimately are obtained by Michigan-Sealy may not be

made available to the plaintiffs. On remand, the magistrate shall draft an appropriate protective order to this effect prior to requiring production of any documents to Michigan-Sealy.

### F. Work-Product Doctrine

In their memoranda submitted to this Court, defendants for the first time have raised the argument that the work-product doctrine provides a basis for refusing production of these documents. Plaintiffs have not responded to the merits of this argument, but rather have argued that defendants' failure to raise the point in the proceedings before the magistrate should preclude them from raising the point at this time.

Inasmuch as there has been no ascertainable prejudice to plaintiffs from defendants' failure to raise the point until now, the Court will not bar defendants from raising the point at this time. Nor, however, will the Court rule on this issue. The true reason for defendants' failure to raise the issue before Magistrate Cooley—the explanations offered by defendants to this Court have been singularly unpersuasive—are best known to defendants. But it is clear that if this Court were to consider the work-product doctrine issue raised by defendants, it would subvert the underlying purpose of the Court's referral of this case to Magistrate Cooley. As emphasized earlier, it is the intention of this Court to allow the magistrate to rule definitively on all pretrial motions except those involving ultimate issues. Work-product issues certainly fall within this category. Accordingly, the Court remands the motions concerning the Moffit, Rosenfeld, and Hertz documents for consideration by the magistrate of the applicability of the work-product doctrine. As indicated earlier, should the parties choose to appeal the magistrate's ruling on this issue, the standard of review applied by this Court will be the "clearly erroneous or contrary to law" test.

To summarize, the Court affirms the magistrate's conclusion that the following documents are not privileged:

Moffit Documents Numbers 1–7, part of 9, 11–13, 15–17

Rosenfeld Documents Numbers 1–9, 11–19

Hertz Documents Numbers 1–21

The Court reverses the magistrate's ruling that Moffit Document Number 8 is not privileged. The Court also reverses the magistrate's holding that any privilege attaching to Moffit Documents Numbers 8, part of 9, 10, 14 and Rosenfeld Document Number 10 has been waived. Accordingly, Moffit Documents Number 8, part of 9, 10, 14 and Rosenfeld Document Number 14 are privileged and may not be produced to plaintiffs. In addition, the Court holds that the ongoing fraud exception and the pendency of the derivative claim do not lift the privilege, and that any entitlement of Michigan-Sealy to certain documents does not require their production to plaintiffs as well. Finally, the question of whether the work-product doctrine bars production of the non-privileged documents will be remanded to the magistrate for consideration and ruling.

### IV. *Moffit Motion For Protective Order*

Moffit has sought entry of a protective order permitting him to disclose in deposition testimony relating to:

(a) any meetings at which he was in attendance with one or more of the other defendants or with his or their counsel;

(b) any oral communications including telephone conversations which he had with any other defendant or with his or another defendant's counsel;

(c) any documents which he has possessed or has seen relating to meetings or communications with another defendant or with his or another defendant's counsel; and

(d) any other matter within his personal knowledge relating to his participation in a joint defense with any other defendant.

The magistrate ruled that Michigan-Sealy was entitled to obtain Moffit's testimony in these areas insofar as relevant to its claims.

In addition, the magistrate ruled that plaintiffs were entitled to the information received by Michigan-Sealy, and further that they could obtain information relating to actions prior to the verdict in the 1971 case as they relate to the claims under section 1 of the Sherman Act, 15 U.S.C. § 1, and post-verdict conduct relevant to their section 8 claim, by virtue of the ongoing fraud exception and the pendency of the derivative claim. Finally, the magistrate ruled that Michigan-Sealy could obtain any discovery-relevant information that was secured by plaintiffs.

The Court, for reasons stated above, agrees that Michigan-Sealy may pierce the attorney-client privilege. However, as stated above, plaintiffs are not entitled to any information merely because it was obtained by Michigan-Sealy by virtue of its posture as an adversary in subsequent litigation. Nor may plaintiffs avoid the joint defense privilege by reason of the ongoing fraud exception and the pendency of the derivative count. Finally, Michigan-Sealy may not obtain information which otherwise would be unavailable to it simply because plaintiffs may be entitled to such information.

Accordingly, the Court affirms Magistrate Cooley's ruling that the attorney-client privilege does not bar Michigan-Sealy from eliciting the specified information from Moffit. In all other respects, however, the magistrate's ruling on this issue is reversed. As with the Moffit, Rosenfeld, and Hertz documents, defendants have raised in this Court for the first time the applicability of the work-product doctrine. Accordingly, this motion is remanded to Magistrate Cooley for determination of whether the work-product doctrine bars disclosure of any of the information which Moffit seeks to reveal.

### V. *Motion To Compel Deposition Answers By Coff*

In ruling that Coff was required to answer questions regarding documents he prepared pursuant to the "WYRK" plan, the magistrate concluded that Coff's function primarily was business rather than legal in nature, and thus not privileged. Upon review of this finding, the Court holds that this conclusion was neither clearly erroneous nor contrary to law.

"[I]t seems well settled that the requisite professional relationship [to establish privilege] is not established when the client seeks personal or business advice, as opposed to legal assistance." *Radiant Burners*, 320 F.2d at 324. Often times, however, the lawyer's function requires him to give both legal and business advice in the same matter. Thus, it has been recognized that in providing legal advice an attorney may incorporate relevant nonlegal, or business, considerations without losing the privilege. *United States v. International Business Machine*, 66 F.R.D. 206, 212 (S.D.N.Y.1974). "However, this does not mean that the privilege attaches to incidental legal advice given by an attorney acting outside the scope of his role as an attorney." *Id.* Thus, in determining whether mixed legal-business advice qualifies for the privilege, the Court must ascertain whether the predominant nature of the consultation in fact was legal or business-oriented.

The Court believes that this was the standard applied by the magistrate, and, upon review of the documents at issue, that the magistrate did not err in concluding that the advice given was predominantly business in nature. Although legal considerations are found in the documents, they are few in number and are not considered at length. The emphasis of these documents is placed upon the business considerations attendant to a decision by four licensees to combine in some fashion. This is evident from an examination of the memoranda prepared by Coff—PDX 1425–1427—as well as the correspondence to Coff from his clients, the latter of which focused almost exclusively on business rather than legal aspects of the proposed combination. *See* PDX 1423, 1428. This suggests that Coff was retained primarily for his expertise as a business consultant, with any legal advice he rendered to be considered as "incidental." *See International Business Machine*,

66 F.R.D. at 212. Accordingly, the Court affirms the magistrate's finding that the information in question is not subject to the privilege. However, since Coff has raised the work-product doctrine here for the first time, this motion too will be remanded to the magistrate for consideration of that issue.[14]

### VI. *Steiner Deposition*

The magistrate set July 15, 1980, as the date upon which defendant Sealy would have to designate the experts it intends to consult or call to testify at trial. If Professor Peter O. Steiner was designated an expert, then plaintiffs would be allowed to depose him for a period not to exceed six hours on or before August 31, 1980. Although these dates were not met due to the pendency of the motions before this Court, we concur with the substance of the magistrate's order.

Defendants argue primarily that it is premature to require the designation of experts and the deposition of Steiner in light of the unsettled nature of the litigation. However, the Court's opinion of August 1, 1980, narrowed the issues in the case considerably. In light of this, it certainly is not unreasonable to require defendants in this four-year-old case to designate experts and to permit the deposition of Steiner, if he is designated as an expert. Accordingly, the substance of Magistrate Cooley's order is affirmed. On remand, the magistrate may set new schedules for the designation of experts by defendants and the deposition of Steiner should he be so designated. It is so ordered.

---

14. For the reasons stated above, however, the Court reverses the magistrate's rulings that assuming the existence of privilege it is waived by the ongoing fraud exception and the pendency of the derivative suit. Nor would Michigan-Sealy be entitled to any documents or information to which it fails to establish individual entitlement solely due to plaintiffs' success in obtaining the information.